MENDHEIM, Justice.
Tara Lynd, a physician ("Dr. Lynd"), appeals from a summary judgment entered by the Marshall Circuit Court in favor of Marshall County Pediatrics, P.C. ("MCP"), in her action seeking a judgment *1044 declaring the proper valuation of her shares in MCP. We reverse and remand.
I. Facts
In July 1978, John M. Packard, M.D. ("Dr. Packard"), filed articles of incorporation forming MCP, a medical practice specializing in pediatrics in Guntersville. At the same time, MCP adopted bylaws. Those bylaws reference a separate "stockholder agreement," but one was never executed. Over time, Dr. Packard hired other physicians to work with him in MCP. In 2005, Dr. Packard hired Dr. Lynd as a pediatrician to work for MCP.
On July 1, 2013, Dr. Packard retired from practice, and he sold MCP to four other physicians who were then working for MCP: Dr. David Chupp, Dr. Don Jones, Dr. Sarah Rhodes, and Dr. Lynd. On July 31, 2013, each of the four physicians executed separate agreements pursuant to which each physician purchased 25 percent of Dr. Packard's shares in MCP-each agreeing to pay him $25,000-for a total purchase price of $100,000. At the time of sale, each physician paid Dr. Packard $1,000, with the understanding that he or she would pay Dr. Packard the remaining amount due for his or her shares, with interest, over a period of several years.
At the time the four physicians acquired MCP from Dr. Packard, they accepted the bylaws without alteration. They did not execute a stockholder agreement. Dr. Rhodes stated in an affidavit that the physicians had "no intent or purpose to avoid" executing a stockholder agreement among themselves; she stated that they "simply never got it done."
At a meeting of the shareholders held on August 27, 2013, following Dr. Packard's retirement, each of the four physicians, including Dr. Lynd, was elected as a director of MCP. Dr. Lynd was also elected secretary of MCP.
On March 2, 2014, Dr. Lynd telephoned each of the other physicians to inform him or her that she would be leaving MCP to go to Oklahoma to care for her mother, whose health was declining. On April 3, 2014, Dr. Lynd provided written notice to the other physicians that she was leaving the practice effective June 30, 2014. However, following a meeting of the shareholders on May 7, 2014, Dr. Lynd determined that she could no longer work at MCP, and she issued a resignation letter and severed her employment with MCP on May 16, 2014. At a shareholder meeting specially called on December 29, 2014, the other three physicians officially voted to remove Dr. Lynd as a director and an officer of MCP. In an affidavit submitted in the trial court, Dr. Lynd stated that she was no longer licensed to practice medicine in Alabama.
Dr. Rhodes testified in her affidavit that, upon Dr. Lynd's severance from MCP, the other three physicians did not dispute that Dr. Lynd was owed her portion of the receivables/production bonuses generated by MCP. According to Dr. Rhodes, MCP paid Dr. Lynd $43,783.60 in receivables/production bonuses. Dr. Rhodes also stated that, as of the date Dr. Lynd severed her employment with MCP, Dr. Lynd had personally paid Dr. Packard $1,000 and that, through the practice, Dr. Lynd had paid an additional $11,261.40 toward the $25,000 purchase price for her shares of stock in MCP.
Dr. Lynd demanded, based on the bylaws, that MCP purchase her shares in the practice at "fair value." Article VI, § 4, of MCP's bylaws provides:
"If any shareholder of the corporation for any reason ceases to be duly licensed to practice medicine in the state of Alabama, accepts employment that, pursuant to law, places restrictions or limitations upon his continued rendering of *1045 professional services as a physician, or upon the death or adjudication of incompetency of a stockholder or upon the severance of a stockholder as an officer, agent, or employee of the corporation, or in the event any shareholder of the corporation, without first obtaining the written consent of all other shareholders of the corporation shall become a shareholder or an officer, director, agent or employee of another professional service corporation authorized to practice medicine in the State of Alabama, or if any shareholder makes an assignment for the benefit of creditors, or files a voluntary petition in bankruptcy or becomes the subject of an involuntary petition in bankruptcy, or attempts to sell, transfer, hypothecate, or pledge any shares of this corporation to any person or in any manner prohibited by law or by the By-Laws of the corporation or if any lien of any kind is imposed upon the shares of any shareholder and such lien is not removed within thirty days after its imposition, or upon the occurrence, with respect to a shareholder, of any other event hereafter provided for by amendment to the Certificates of Incorporation or these By-Laws, then and in any such event, the shares of this [c]orporation of such shareholder shall then and thereafter have no voting rights of any kind, and shall not be entitled to any dividend or rights to purchase shares of any kind which may be declared thereafter by the corporation and shall be forthwith transferred, sold, and purchased or redeemed pursuant to the agreement of the stockholders in [e]ffect at the time of such occurrence. The initial agreement of the stockholders is attached hereto and incorporated herein by reference[;] however, said agreement may from time to time be changed or amended by the stockholders without amendment of these By-Laws. The method provided in said agreement for the valuation of the shares of a deceased, retired or bankrupt stockholder shall be in lieu of the provisions of Title 10, Chapter 4, Section 228 of the Code of Alabama of 1975."
(Emphasis added.)
Dr. Lynd and the other three physicians disagreed as to the method of valuation for Dr. Lynd's shares in MCP. Dr. Lynd insisted that the valuation should be based on the "fair value" of the shares, pursuant to the method for valuing stock provided in § 10A-4-3.02, Ala. Code 1975. The relevant subsections of § 10A-4-3.02 provide:
"(a) Upon the death of a shareholder of a domestic professional corporation or if a shareholder of a domestic professional corporation becomes a disqualified person or if shares of a domestic professional corporation are transferred by operation of law or court decree to a disqualified person, the shares of the deceased shareholder or of the disqualified person may be transferred to a qualified person and, if not so transferred, shall be purchased or redeemed by the domestic professional corporation to the extent of funds which may be legally made available for the purchase.
"(b) If the price for the shares is not fixed by the governing documents of the domestic professional corporation or by private agreement, the domestic professional corporation, within six months after the death or 30 days after the disqualification or transfer, as the case may be, shall make a written offer to pay for the shares at a specified price deemed by the domestic professional corporation to be the fair value thereof as of the date of the death, disqualification or transfer...."
(Emphasis added.) Based on a valuation pursuant to § 10A-4-3.02, Dr. Lynd calculated her shares to be worth $230,000.
*1046 Conversely, the other three physicians insisted that the valuation should be based on the "book value" of the shares, pursuant to the method provided in former § 10-4-228, Ala. Code 1975 (repealed in 1980), referenced in the bylaws, which stated, in pertinent part:
"The articles of incorporation may provide for the purchase or redemption of the shares of any shareholder upon the death or disqualification of such shareholder, or the same may be provided in the bylaws or by private agreement. In the absence of a provision for the same in the articles of incorporation or the bylaws or by private agreement, the professional corporation shall purchase the shares of a deceased shareholder or a shareholder no longer qualified to own shares in such corporation within 90 days after the death of the shareholder or disqualification of the shareholder, as the case may be. The price for such shares shall be the book value as of the month immediately preceding the death or disqualification of the shareholder. Book value shall be determined from the books and records of the professional corporation in accordance with the regular method of accounting used by such corporation...."[1]
(Emphasis added.) Based on a valuation pursuant to § 10-4-228, the other three physicians calculated Dr. Lynd's shares to be worth $6,275.
On April 21, 2015, Dr. Lynd sued MCP in the Marshall Circuit Court, asserting a claim of breach of contract and seeking specific performance of MCP's obligation to purchase her stock as well as a judgment declaring that she was entitled to the "fair value" of those shares from MCP. MCP filed an answer to the complaint.
On September 20, 2016, Dr. Lynd filed a motion for a summary judgment along with a brief and exhibits in support of the motion. On October 3, 2016, MCP filed a motion for a summary judgment along with a brief and exhibits in support of its motion. Following a hearing on the motions, the parties submitted supplemental briefs.
On December 27, 2016, the trial court entered an order granting MCP's summary-judgment motion and denying Dr. Lynd's summary-judgment motion. In pertinent part, the order stated that "[t]he value of stock rights of Dr. Lynd is set at book value on [the] date she left the practice."
On January 9, 2017, Dr. Lynd filed a motion to alter, amend, or vacate the trial court's December 27, 2016, order in favor of MCP. MCP filed a reply to the motion on March 28, 2017. Following a hearing on the motion, the trial court entered an order on March 31, 2017, denying Dr. Lynd's motion. The order stated, in pertinent part:
"The Court's Order of December 27, 2016, is hereby affirmed, denying [Dr.
*1047 Lynd's] Motion for Summary Judgment and all relief requested by [Dr. Lynd] and [MCP's] Motion for Summary Judgment is granted in full, thereby confirming the finding that the value of [Dr. Lynd's] stock is 25% of book value, $6,275.00. All other relief not granted herein is denied."
Dr. Lynd appeals.
II. Standard of Review
" 'This Court reviews a summary judgment de novo. Turner v. Westhampton Court, L.L.C., 903 So.2d 82, 87 (Ala. 2004). We seek to determine whether the movant has made a prima facie showing that there exists no genuine issue of material fact and has demonstrated that the movant is entitled to a judgment as a matter of law. Turner, supra. In reviewing a summary judgment, this Court reviews the evidence in the light most favorable to the nonmovant. Turner, supra. Once the movant makes a prima facie showing that he is entitled to a summary judgment, the burden shifts to the nonmovant to produce "substantial evidence" creating a genuine issue of material fact. Ala. Code 1975, § 12-21-12 ; Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989). "Substantial evidence" is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Fla., 547 So.2d 870, 871 (Ala. 1989).'
" Muller v. Seeds, 919 So.2d 1174, 1176-77 (Ala. 2005). As is true with regard to a trial court's rulings on questions of law in the context of a bench trial, we review de novo questions of law arising in the context of a summary judgment."
Van Hoof v. Van Hoof, 997 So.2d 278, 286 (Ala. 2007).
III. Analysis
Dr. Lynd contends that the trial court erred in determining that book value would be used to value her stock in MCP because, she argues, neither the bylaws, the law as established by the legislature, nor equity dictates using book value. As Dr. Lynd notes, the trial court apparently concluded that the bylaws required following the valuation standard set out in § 10-4-228, even though the trial court's orders did not expressly state that it was following that statute. MCP agrees that the trial court applied § 10-4-228 because it was referenced in the bylaws, specifically in Art. VI, § 4. The parties extensively debate the meaning of the reference to § 10-4-228 in Art. VI, § 4.
In pertinent part, Art. VI, § 4, of the bylaws provides:
"[U]pon the severance of a stockholder as an officer, agent, or employee of the corporation, ... the shares of this [c]orporation of such shareholder shall then and thereafter have no voting rights of any kind, and shall not be entitled to any dividend or rights to purchase shares of any kind which may be declared thereafter by the corporation and shall be forthwith transferred, sold, and purchased or redeemed pursuant to the agreement of the stockholders in [e]ffect at the time of such occurrence. The initial agreement of the stockholders is attached hereto and incorporated herein by reference[;] however, said agreement may from time to time be changed or amended by the stockholders without amendment of these By-Laws. The method provided in said agreement for the valuation of the shares of a deceased, *1048 retired or bankrupt stockholder shall be in lieu of the provisions of Title 10, Chapter 4, Section 228 of the Code of Alabama of 1975."
(Emphasis added.)
For purposes of this case, two issues are presented by the language of Art. VI, § 4: (1) whether a shareholder is entitled to redemption of his or her shares in MCP and, if so, (2) what valuation method is to be used to redeem the shares of a shareholder entitled to such redemption.
As to the first issue, Art. VI, § 4, states that the shares of a shareholder severed from the corporation "shall be forthwith ... redeemed pursuant to the agreement of the stockholders in [e]ffect at the time of such occurrence." (Emphasis added.) Because no stockholder agreement exists, it would appear, based on the plain language of Art. VI, § 4, that Dr. Lynd is not entitled to the redemption of her shares under the bylaws. However, the trial court determined that Dr. Lynd was entitled to the redemption of her shares in MCP, rejecting MCP's argument to the contrary in its motion for a summary judgment. MCP states in its brief that "the circuit court correctly found that Dr. Lynd is entitled to 25% of the net book value, or $6,275.00." MCP's brief, p. 25. Thus, MCP concedes that Dr. Lynd is entitled to some compensation for her shares, even though the bylaws appear to provide otherwise. Consequently, the potential implication of the above-quoted sentence from Art. VI, § 4, of the bylaws is not before us in this appeal.
Because MCP does not contend that Dr. Lynd is owed nothing, we must agree for purposes of this appeal with Dr. Lynd's contention that under Art. VI, § 4, she is entitled to redemption of her shares in MCP. Accordingly, the second issue concerning what valuation method, under the bylaws, will be used to redeem Dr. Lynd's shares in MCP must be addressed.
MCP contends, and the trial court apparently agreed, that Art. VI, § 4, of the bylaws requires using the valuation method described in § 10-4-228, i.e., book value. This is so, MCP says, because the bylaws constitute a contract and "the Bylaws clearly indicated [the] understanding and expectation [of the members of MCP] that any stock rights would be valued as provided in Section 228 ...." MCP's brief, p. 16. In contrast, Dr. Lynd argues that the plain language of Art. VI, § 4, shows that the original directors expressly rejected using § 10-4-228 as a method for valuing redeemed stock. See Dr. Lynd's brief, p. 25.
This Court has stated that " '[i]t is well established that the constitution, bylaws, rules and regulations of a voluntary association constitute a contract between the association's members, which is binding upon each member so long as the bylaws, etc., remain in effect.' " Turner v. W. Ridge Apartments, Inc., 893 So.2d 332, 335 (Ala. 2004) (quoting Wells v. Mobile Cty. Bd. of Realtors, Inc., 387 So.2d 140, 142 (Ala. 1980) ). We have further explained that "[c]orporate documents such as by-laws and membership certificates are equivalent to contracts among the members of the organization.... Accordingly, normal rules of construction for contracts apply." Black v. Glass, 438 So.2d 1359, 1367 (Ala. 1983).
"When interpreting a contract, this Court must first look to the plain language of the contract and determine whether that language is ambiguous. '[A] court should give the terms of the agreement their clear and plain meaning and should presume that the parties intended what the terms of the agreement clearly state.' Ex parte Dan Tucker Auto Sales, Inc., 718 So.2d 33, 36 (Ala. 1998)
*1049 (citing Pacific Enters. Oil Co. (USA) v. Howell Petroleum Corp., 614 So.2d 409 (Ala. 1993) ). 'A court may not make a new contract for the parties or rewrite their contract under the guise of construing it.' Ex parte Dan Tucker Auto Sales, 718 So.2d at 35-36 (citing Estes v. Monk, 464 So.2d 103 (Ala. Civ. App. 1985) )."
Turner, 893 So.2d at 335.
The relevant portion of Art. VI, § 4, provides: "The method provided in [the] agreement [of the stockholders] for the valuation of the shares of a deceased, retired or bankrupt stockholder shall be in lieu of the provisions of Title 10, Chapter 4, Section 228 of the Code of Alabama of 1975." The difficulty presented here is that there is no stockholder agreement.
MCP contends that because the stockholders failed to execute an agreement, Art. VI, § 4, intends for § 10-4-228 to apply for the valuation of Dr. Lynd's shares. MCP argues that the question that must be answered is: What would the stockholders' expectation concerning a valuation method have been in the event no stockholder agreement was ever executed? It answers:
"Clearly, the parties' expectation would be that 'book value' would be used, and, as there is no prohibition on the use of 'book value' (although one could have easily been included), the Bylaws reflect a recognition of, comfort with, and assent to, the 'book value' methodology as the contingency in the event that, for whatever reason, the parties do not draft a separate agreement."
MCP's brief, p. 19. There are, however, at least two readily apparent problems with this argument.
First, the only intention clearly conveyed in the language of Art. VI, § 4, of the bylaws is that a stockholder agreement would be executed and that that agreement would dictate the valuation method. Before the final sentence concerning the method of valuation for the redemption of stock, § 4 states that the shares of a shareholder severed from the corporation
"shall be forthwith ... redeemed pursuant to the agreement of the stockholders in [e]ffect at the time of such occurrence. The initial agreement of the stockholders is attached hereto and incorporated herein by reference [;] however, said agreement may from time to time be changed or amended by the stockholders without amendment of these By-Laws."
(Emphasis added.) Article VI, § 4, was written and adopted with the intention that the stockholders would execute an agreement addressing the details of the transfer, purchase, or redemption of the stock of a severed stockholder.
Moreover, there is no expressed intention of what should be done in the event no stockholder agreement is executed. Black's Law Dictionary defines "in lieu of" to mean "[i]nstead of or in place of; in exchange or return for." Black's Law Dictionary 907 (10th ed. 2014). See also National Sewing-Mach. Co. v. Willcox & Gibbs Sewing-Mach. Co., 74 F. 557, 560 (3d Cir. 1896) (" 'In lieu of' means 'instead' of, 'in place of,' 'in substitution for.' "). Thus, the plain meaning of the final sentence of Art. VI, § 4, is that the method for valuation of shares for the purpose of redemption will be provided in the stockholders' agreement instead of the method provided in § 10-4-228. In other words, the bylaws expressly reject the valuation method provided in § 10-4-228 in favor of a method that would be provided in the stockholder agreement. MCP's argument that the reference to § 10-4-228 constitutes a perpetual fallback provision in the absence of a stockholder agreement divines an intention from the bylaws that simply is not present *1050 in the language of Art. VI, § 4. The clear intent of the parties executing the bylaws was to avoid a "book value" valuation in favor of one agreed to by the parties.
We acknowledge that a contract presumes that the applicable law is the law that is in effect at the time the contract is executed. See, e.g., Macon Cty. Greyhound Park, Inc. v. Knowles, 39 So.3d 100, 108 (Ala. 2009) (observing that " ' "every contract is made with reference to existing law and every law affecting the contract is read into and becomes a part of the contract when made" ' " (quoting Barber Pure Milk Co. v. Alabama State Milk Control Bd., 275 Ala. 489, 494, 156 So.2d 351, 355 (1963), quoting in turn Bush v. Greer, 235 Ala. 56, 58, 177 So. 341 (1937) ) ); Baldwin Cty. Elec. Membership Corp. v. Lee, 804 So.2d 1087, 1090 (Ala. 2001) (noting that "[p]rovisions governing corporate operations include not only a corporation's articles of incorporation and bylaws, but also relevant sections of the statutory scheme under which the corporation exists"). Thus, when the bylaws were adopted in 1978, § 10-4-228 was the default provision for valuing shares of a deceased or disqualified shareholder of a public corporation for purchase or redemption. The method of valuation provided in § 10-4-228 applied as a matter of law, not contract; to avoid the application of the default provision, it was necessary only to state that the stockholders desired a different method of valuation from that provided in the law, and that was clearly the intention in MCP's bylaws. MCP's bylaws sought to reject the default provision for the valuation of stock that existed in 1978 in favor of a method that would be agreed upon by the stockholders. Given the plain meaning of the term "in lieu of," the final sentence of Article VI, § 4, cannot plausibly be read to embed § 10-4-228 in perpetuity as a fallback valuation method in the event no stockholder agreement was executed.
Moreover, as Dr. Lynd notes, in 1984 the legislature replaced § 10-4-228 with § 10-4-389, Ala. Code 1975, which provided, in pertinent part:
"(a) Upon the death of a shareholder of a domestic professional corporation or if a shareholder of a domestic professional corporation becomes a disqualified person or if shares of a domestic professional corporation are transferred by operation of law or court decree to a disqualified person, the shares of such deceased shareholder or of such disqualified person may be transferred to a qualified person and, if not so transferred, shall be purchased or redeemed by the domestic professional corporation to the extent of funds which may be legally made available for such purchase.
"(b) If the price for such shares is not fixed by the articles of incorporation or bylaws of the domestic professional corporation or by private agreement, the domestic professional corporation, within six months after such death or 30 days after such disqualification or transfer, as the case may be, shall make a written offer to pay for such shares at a specified price deemed by such domestic professional corporation to be the fair value thereof as of the date of such death, disqualification or transfer...."
(Emphasis added.) Thus, as of 1984, fair value became the default method of valuation for the redemption of shares in a professional corporation under the law addressing that issue.
In 2009, the legislature amended § 10-4-389 and renumbered it as § 10A-4-3.02, Ala. Code 1975, which provides, in pertinent *1051 part:[2]
"(a) Upon the death of a shareholder of a domestic professional corporation or if a shareholder of a domestic professional corporation becomes a disqualified person or if shares of a domestic professional corporation are transferred by operation of law or court decree to a disqualified person, the shares of the deceased shareholder or of the disqualified person may be transferred to a qualified person and, if not so transferred, shall be purchased or redeemed by the domestic professional corporation to the extent of funds which may be legally made available for the purchase.
"(b) If the price for the shares is not fixed by the governing documents of the domestic professional corporation or by private agreement, the domestic professional corporation, within six months after the death or 30 days after the disqualification or transfer, as the case may be, shall make a written offer to pay for the shares at a specified price deemed by the domestic professional corporation to be the fair value thereof as of the date of the death, disqualification or transfer...."[3]
(Emphasis added.) Consequently, when it amended § 10-4-389, the legislature retained fair value as the default method of valuation for the redemption of shares in a professional corporation. Additionally, § 10A-4-5.08(a), Ala. Code 1975, provides, in part, that "[t]he provisions of this chapter shall apply to all existing corporations organized under the statute formerly codified as Article 11 of Chapter 4, Title 10 and repealed by Acts 1983, No. 83-514, effective January 1, 1984 ...." MCP was such a corporation, i.e., one organized under the now repealed Title 10; there is no question that § 10A-4-3.02 is the default provision for valuation of the redemption of its stock.
MCP's interpretation of the bylaws would require us to ignore the changes in the law described in the foregoing two paragraphs. Essentially, MCP contends that the final sentence of Art. VI, § 4, of the bylaws states: "The method provided in [the stockholder] agreement for the valuation of the shares of a deceased, retired or bankrupt stockholder will govern, but if no stockholder agreement is executed, the method of valuation provided in § 10-4-228 will govern, even if there has been a change in the law." The sentence plainly does not say this. It states: "The method provided in [the stockholder] agreement for the valuation of the shares of a deceased, retired or bankrupt stockholder shall be in lieu of the provisions of Title 10, Chapter 4, Section 228 of the Code of Alabama of 1975." (Emphasis added.) The phrase "in lieu of the provisions of Title 10, Chapter 4, Section 228 of the Code of Alabama of 1975" plainly describes and rejects the current relevant statutory provision at the time the bylaws were executed, a provision that subsequently was replaced with a provision codifying a fair-value methodology 30 years before the *1052 four physicians acquired their interests in MCP.
A second problem with MCP's argument is that, even if it is assumed that the final sentence of Art. VI, § 4, plausibly could be read to mean that, if no stockholder agreement is executed, the method of valuation provided in § 10-4-228 applies in perpetuity, by its plain language that sentence does not apply to Dr. Lynd's circumstances. The sentence states that it applies to "the shares of a deceased, retired or bankrupt stockholder." Dr. Lynd was not severed from MCP as a result of death, retirement, or bankruptcy. Therefore, the events that would trigger the application of the method of valuation provided in § 10-4-228 under MCP's reading of the final sentence of Art. VI, § 4, do not apply to Dr. Lynd. In other words, even under MCP's interpretation, the final sentence of Art. VI, § 4, would provide for use of the book-value method only when there is no stockholder agreement and the stock is being redeemed for a deceased, retired, or bankrupt stockholder; Dr. Lynd is not such a stockholder.
Based on the foregoing, we conclude that Art. VI, § 4, of the bylaws does not require the application of § 10-4-228 and its preference for book value as to the redemption of Dr. Lynd's stock. Therefore, Dr. Lynd has demonstrated that the trial court's judgment is erroneous in this regard.
Dr. Lynd further contends that the trial court erred by not using the fair-value method for valuation of her stock in MCP. In advancing that argument, Dr. Lynd is essentially contending that the trial court should have granted her motion for a summary judgment.
"Ordinarily, a party may not appeal from the denial of a summary-judgment motion. Parsons Steel, Inc. v. Beasley, 522 So.2d 253, 258 (Ala. 1988) ('An order denying summary judgment is interlocutory and nonappealable.'). Where cross-motions for a summary judgment are filed in the trial court, the party whose motion was not granted is entitled to have that motion reviewed on an appeal from the grant of the opponent's motion ...."
Mountain Lakes Dist., N. Alabama Annual Conference, United Methodist Church, Inc. v. Oak Grove Methodist Church, 126 So.3d 172, 180 (Ala. Civ. App. 2013) (citing Lloyd Noland Found. v. City of Fairfield Healthcare Auth., 837 So.2d 253, 263 (Ala. 2002) ). This means that Dr. Lynd had to demonstrate that, as a matter of law, she was entitled to fair value for her shares of stock in MCP.
Dr. Lynd first contends that § 10A-4-3.02, as the current default provision for valuation for the redemption of shares in a professional corporation, requires the use of fair value as the method for valuing her shares in MCP. As MCP observes, however, in order for § 10A-4-3.02 to apply, Dr. Lynd must demonstrate that she is a "disqualified person" under the statute. This is so because § 10A-4-3.02(a) states, in relevant part: "Upon the death of a shareholder of a domestic professional corporation or if a shareholder of a domestic professional corporation becomes a disqualified person..., the shares ... of the disqualified person ... shall be purchased or redeemed by the domestic professional corporation ...." (Emphasis added.) Thus, § 10A-4-3.02 applies only to instances in which a stockholder dies or "becomes a disqualified person."
Dr. Lynd contends that she is "disqualified" because she is no longer eligible to hold stock in MCP according to its articles of incorporation. Under the articles of incorporation, Dr. Lynd is not qualified to own shares in MCP because she is no *1053 longer an employee of MCP and she is no longer licensed to practice medicine in Alabama.[4] But "disqualification" for purposes of § 10A-4-3.02 has a different meaning than the one expressed in MCP's corporate organizational documents.
Section 10A-4-1.03(1), Ala. Code 1975, defines a "disqualified person" as "[a]ny person who is not a qualified person." Section 10A-4-1.03(6) a., Ala. Code 1975, defines a "qualified person" "[w]ith respect to any domestic professional corporation" as "[a]n individual who is authorized by law of Alabama or of any qualified state to render a professional service permitted by the certificate of formation of the professional corporation." Thus, under § 10A-4-3.02(a), disqualification is based on a person's professional licensing status.
As we have already noted, it is undisputed that Dr. Lynd is no longer licensed to practice medicine in Alabama. Dr. Lynd has not demonstrated, however, that she is not licensed to practice medicine in any "qualified state" under § 10A-4-1.03(7), Ala. Code 1975.[5] For Dr. Lynd to be entitled to a summary judgment on this basis, she had to demonstrate that she is a "disqualified person" in all respects under § 10A-4-3.02(a), and she failed to meet this burden.
Dr. Lynd also contends that, even if she is not a "disqualified person" under § 10A-4-3.02, the fair-value method is "an equitable approach to the valuation of shares of stock." Dr. Lynd's brief, p. 45. In support of this assertion, Dr. Lynd cites some divorce cases and cases involving dissenting shareholders in which Alabama courts have concluded that fair value is an equitable method of determining the amount shareholders are entitled to receive for their stock. See, e.g., Grelier v. Grelier, 44 So.3d 1092, 1098 (Ala. Civ. App. 2009) ; Offenbecher v. Baron Servs., Inc., 874 So.2d 532, 536 (Ala. Civ. App. 2002).
Dr. Lynd is correct that there is support for using the fair-value method in the context of equity jurisprudence, but she fails to provide a persuasive argument or to cite any authority for why invoking equity jurisdiction in the context of this case is required as a matter of law. Dr. Lynd argues that "the court is compelled to invoke its equitable powers to arrive at a fair method to value the stock of Dr. Lynd" because "of the simple fact that the Bylaws of the corporation unequivocally require purchase of Dr. Lynd's stock by MCP, but simply fail[ ] to provide a method of valuation." Dr. Lynd's brief, p. 40.
Dr. Lynd's argument does not accurately reflect the state of affairs in this *1054 case. The bylaws did announce the manner in which a valuation method would be chosen: a stockholder agreement would provide the method of valuation. But Dr. Lynd and the other stockholders failed to execute such a stockholder agreement. Consequently, Dr. Lynd is asking this Court to invoke equity jurisdiction to supply an agreement the parties never reached, even though the bylaws clearly intended that the parties would reach an agreement. "Courts cannot make contracts for parties, but must give such contracts as are made a reasonable construction and enforce them accordingly." Charles H. McCauley Assocs., Inc. v. Snook, 339 So.2d 1011, 1015 (Ala. 1976).
Moreover, "inadequacy of a remedy at law is one of the foundation stones of equity jurisdiction, and it is a fundamental rule that before a complainant is entitled to relief in a court of equity he must have no plain and adequate remedy at law." White v. Hale, 234 Ala. 385, 386, 175 So. 288, 289 (1937). Dr. Lynd has not demonstrated that there is no plain and adequate remedy at law available to her.
Because Dr. Lynd has failed to demonstrate that she should receive the fair value of her stock in MCP, the trial court did not err in denying her motion for a summary judgment.
IV. Conclusion
Dr. Lynd has demonstrated that the trial court erred in applying § 10-4-228 and therefore also in ordering that MCP redeem Dr. Lynd's shares at book value. In other words, the trial court erred in entering a summary judgment in favor of MCP. However, Dr. Lynd has not adequately demonstrated that she was entitled as a matter of law to the specific relief she requested, i.e., valuation of her stock in MCP based on fair value. Therefore, the trial court did not err in refusing to enter a summary judgment in Dr. Lynd's favor. Therefore, we reverse the summary judgment entered in favor of MCP and remand this case to the trial court for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
Stuart, C.J., and Parker, Main, and Bryan, JJ., concur.

Concerning book value, one court has explained:
" 'Book value of a share of stock, in its simplest form, is the corporation's assets minus its liabilities as shown on the corporate books, divided by the number of shares of stock outstanding.' 1 O'Neal's Close Corporations § 7.27. This method of valuation is frequently used in buy-out agreements because of its simplicity. While book value gives a 'snapshot' of the value of a corporation at any point in time, it is not intended to represent the fair market value of a corporation. It does not, for example, reflect the value of company goodwill. The value of the company's assets and equipment as shown on the balance sheet represents the depreciated value of such assets, not their fair market value."
Crowder Constr. Co. v. Kiser, 134 N.C. App. 190, 202-03, 517 S.E.2d 178, 187 (1999).

The 2009 amendment, which was part of an extensive rewriting of the Business Code, was effective January 1, 2011.

Section 10A-2-13.01, Ala. Code 1975, defines " 'Fair Value,' with respect to a dissenter's shares" to mean "the value of the shares immediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action unless exclusion would be inequitable." Section 10A-2-13.01 is relevant because § 10A-4-1.02, Ala. Code 1975, states that "[t]he provisions of the Alabama Business Corporation Law shall apply to professional corporations, domestic and foreign, except to the extent the provisions are inconsistent with the provisions of this chapter ...."

Article ten of the articles of incorporation provides:
"In the event a shareholder becomes legally disqualified to practice medicine in the State of Alabama ... the financial and employment interest of said shareholder in this corporation shall terminate and his shares in said corporation shall be disposed of in a manner to be established by the By-Laws of this Corporation or by written agreement existing between the shareholders at such time."
Article thirteen of the articles of incorporation provides: "All shareholders of the corporation shall be employees of the corporation ...."

It appears that, after she left Alabama for Oklahoma, Dr. Lynd became licensed and now practices medicine there. Dr. Lynd did not argue in the trial court and makes no effort to demonstrate to this Court that Oklahoma is not a "qualified state." § 10A-4-1.03(7), Ala. Code 1975. See Rule 28(a)(10), Ala. R. App. P.; Ex parte Borden, 60 So.3d 940, 944 (Ala. 2007) (noting that "waiver of an argument for failure to comply with Rule 28(a)(10), Ala. R. App. P.," occurs when "there is no argument presented in the brief and there are few, if any, citations to relevant legal authority, resulting in an argument consisting of undelineated general propositions").